IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GC SERVICES LIMITED PARTNERSHIP, a Delaware limited partnership, | § § § | |
| Petitioner, | § § | |
| VS. | § § | CIVIL ACTION NO. H-19-1180 |
| DENISE LITTLE, an individual, | § § § | |
| Respondent. | § | |

**MEMORANDUM AND ORDER ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.     Introduction: The Issues**

GC Services LP sued Denise Little, a former employee, seeking to enjoin her from pursuing the race-discrimination lawsuit she filed against GC Services in Missouri state court, because she allegedly electronically signed a mandatory arbitration agreement as part of her online application for permanent employment. Ms. Little denied electronically signing the agreement. After this court denied Ms. Little's motion to dismiss, GC Services moved to compel arbitration and to enjoin her from pursuing her state-court action. (Docket Entry Nos. 16, 20).

The court held a bench trial on October 14, 2019, on whether Ms. Little had electronically signed the agreement to arbitrate her claims against GC Services. The parties submitted exhibits and presented evidence. Ms. Little and Amber Taylor, GC Services's Human Resources Regulatory Compliance Director, testified. Jeanetta Parris, an assistant manager for GC Services, and Allison Smith, a payroll specialist, testified by deposition. Based on the pleadings, the briefs,

the exhibits, the testimony, the arguments of counsel, and the applicable law, the court enters the following findings of fact and conclusions of law:[1]

- Ms. Little electronically signed the Mutual Agreement for Dispute Resolution that required her to submit to binding arbitration "all legally cognizable disputes between" herself and GC Services.
- Ms. Little and GC Services formed a valid and broad agreement to arbitrate all disputes.

GC Services is entitled to arbitrate the claims Ms. Little has asserted in her state-court lawsuit. Ms. Little is ordered to stay her pursuit of her Missouri state-court lawsuit pending the arbitration.

The reasons for these findings and conclusions are explained in detail below.

## II. Findings of Fact

### A. Background

In February 2017, Denise Little filed an online application for permanent employment with GC Services, a call-center management company, in the company's Missouri office. (Docket Entry No. 45-1 at 1–14). She had been a temporary employee placed with GC Services by the employment agency she worked for, NextGen. (*Id.* at 53).

While Ms. Little was working for NextGen, an Assistant Manager at GC Services, Jeanetta Parris, handed her a piece of paper with a link for the online application for permanent employment with GC Services, with instructions to complete the online application by February 26, 2017. (Docket Entry No. 46-1 at 157–59, 167–68, 171). An email timestamped 6:51 p.m. on February 26, 2017, from Ms. Parris to her manager at GC Services, Barrye Brasher, states that Ms. Parris "gave each agent" present in the room a paper with the GC Services job posting link. (Docket Entry No. 45-1 at 45). The email includes Ms. Little's name as an agent who received the link.

---

[1] Any findings of fact that are also, or only, conclusions of law are so deemed. Any conclusions of law that are also, or only, findings of fact are so deemed.

(*Id.*).

Amber Taylor, the Director of Human Resources Regulatory Compliance for GC Services, credibly testified and explained the GC Services online application process, including its applicant-tracking system. GC Services uses, and used when Ms. Little's application was filed, a third-party applicant-tracking system called iCIMS. Each applicant must create a unique iCIMS username and password. GC Services does not have access to an applicant's unique login information. The applicant's then-employer, such as NextGen, does not have the ability to access the username or password unless the applicant volunteers to disclose it. Ms. Taylor credibly testified that in her experience, no applicant has disclosed to his or her present employer, the login or password created to apply to become a GC Services employee. Ms. Taylor could not identify a reason an applicant would want to do so.

All online applicants then complete their employment application forms by providing personal information, including their social security number, educational and employment history, and contact information. Before applicants can submit a complete application form, they must "click the box" to electronically sign various documents, including a Mutual Agreement for Dispute Resolution. If an applicant clicks 'Submit' without checking the box to electronically sign the Dispute Resolution Agreement, that applicant cannot proceed to the next step of the application process. An applicant using the online application system can submit the form only after the user checks the signature box and clicks 'Submit' at the bottom of the Mutual Agreement for Dispute Resolution. Ms. Little does not dispute, and offered no evidence controverting, the requirement to include an electronically signed Dispute Resolution Agreement before an application is submitted to GC Services.

The Dispute Resolution Agreement states:

3

> **All Disputes Must be Arbitrated.** It is the intent of the parties hereto that all legally cognizable disputes between them that cannot be resolved to the parties' satisfaction through use of the Company's personnel policies, must be resolved by final and binding arbitration. Claims subject to arbitration include all legally cognizable claims in the broadest context and include, but are not limited to, any dispute about the interpretation, applicability, validity, existence, enforcement, or extent of arbitrability of or under this Agreement, and any claim arising under federal, state, or local statute, regulation, or ordinance, any alleged contract, or under the common law. This includes, by way of non-exhaustive illustration only, any claim of employment discrimination in any alleged form . . . or any other claim, whether contractual, common-law, statutory, or regulatory arising out of, or in any way related to, Individual's application for employment with and/or employment with Company, the termination thereof, this Agreement, or any other matter incident or in any manner related thereto.

(Docket Entry No. 45-1 at 11). The Dispute Resolution Agreement allows suits "to compel or in aid of arbitration," but these suits can be "brought solely and only in the state or federal courts located in Houston, Harris County, Texas." (*Id.* at 11–12).

After an applicant submits a completed application, which must include checking the signature box for the Dispute Resolution Agreement, a GC Services representative countersigns the Dispute Resolution Agreement. GC Services is unable to edit any of the forms or documents, or their timestamps, aside from countersigning them. If and when GC Services decides to hire an applicant and countersigns the forms, it extends a conditional employment offer pending drug screening. Applicants complete the drug screen only after receiving the countersigned form and the conditional offer.

GC Services hired Ms. Little as a permanent employee to work in Missouri on March 7, 2017, based on the online application completed with her name, login and password, and personal information. (*Id.* at 1–14, 44, 82). GC Services terminated Ms. Little's employment on August 21, 2017, citing performance reasons. (*Id.* at 44). In February 2019, Ms. Little sued GC Services

4

in Missouri state court, alleging violations of the Missouri Human Rights Act based on sex and racial discrimination. (Docket Entry No. 1 at ¶ 5; Docket Entry No. 1-2). GC Services alleges that its counsel told Ms. Little that she had to arbitrate her claims, but that Ms. Little refused to do so. (Docket Entry No. 1 at ¶ 20). In April 2019, GC Services sued Ms. Little in this court and moved to compel arbitration, arguing that Ms. Little had agreed to arbitrate any disputes related to her employment. (*Id.* at ¶ 21; Docket Entry No. 20). GC Services has also sought to enjoin Ms. Little from continuing her lawsuit in Missouri state court. (*Id.*). Ms. Little does not dispute that the claims she asserts in that lawsuit are within the scope of the Dispute Resolution Agreement. (Docket Entry No. 23). Instead, she has denied that she signed the Dispute Resolution Agreement, arguing that the electronic signature on the Dispute Resolution Agreement cannot be attributed to her. (*Id.*).

B. **Ms. Little Electronically Signed the Dispute Resolution Agreement.**

On February 26, 2017, an online applicant with the name "Denise Little" and using the email address "Denise19699@msn.com" created an account on the GC Services iCIMS applicant system at 7:48 p.m. (Docket Entry No. 45-1 at 141). Printouts of the February 26, 2017, application of Denise Little include a page showing what the applicant included for the social security number, current address, phone number, and employment record. (*Id.* at 1–3). The iCIMS system shows that the same applicant clicked the box to sign the Mutual Agreement for Dispute Resolution at 8:03 p.m. on February 26, 2017.[2] (*Id.* at 14).

GC Services received the completed application that Ms. Little appeared to have filled out

---

[2] Another version of the printed Dispute Resolution Agreement shows a timestamp of 9:03 p.m. (Docket Entry No. 23 at 5). GC Services has explained that the timestamps "are different because they were printed from different time zones." (Docket Entry No. 24 at 10–11). The other onboarding documents were also printed from Eastern Standard Time, while Ms. Little's location in Missouri put her on Central Standard Time.

5

and submitted on February 26, 2017. (*Id.* at 143). GC Services sent an acknowledgment of receipt to the email address Ms. Little used to send the application to GC Services. (*Id.*). Ms. Little agrees that this was her only email address, and was the email address used for her iCIMS username. GC Services sent the application-receipt confirmation email to Ms. Little's email address on February 26, 2017, at 9:03 p.m. (*Id.*). She denied receiving this email. Her denial is not credible, particularly because it was sent to the only email address she used.

A GC Services Human Resources employee countersigned the Dispute Resolution Agreement the next day. (*Id.* at 14). GC Services extended a conditional employment offer to Ms. Little on March 1, 2017, and she completed her drug screen two days later, March 3. (*Id.* at 17–18, 79).

Between March 2 and March 4, 2017, an applicant using Ms. Little's username and password electronically signed onboarding documents through the online iCIMS system. (*Id.* at 76–137). Most of the onboarding documents bear timestamps between 10:20 a.m. and 11:20 a.m. EST on March 4, 2017. (*Id.*).

Ms. Little contends that GC Services or NextGen—the agency that placed Ms. Little at GC Services as a temporary employee before she applied to be, and was hired as, a permanent employee—applied and electronically signed the Dispute Resolution Agreement for her. Ms. Little denied knowing that anyone had filed an application for her to become a permanent GC Services employee. She argues that "[a]nyone could have created a login" and password for her and filled out and submitted the application without her knowledge, because GC Services's application system does not include additional steps to verify the identity of the applicant. (Docket Entry No. 23 at 8–9).

Ms. Little testified that in February 2017, Jeanetta Parris told her that GC Services "already

6

had her information." She stated that a NextGen employee had asked for her updated resume on February 20, 2017, with no explanation of the need. According to Ms. Little, "[t]his request, plus Jeanetta Parris's statement to [her] just days later that GC Services 'already had her information' supports [Little's] claim that" one of the companies "completed the application on [Little's] behalf," without her knowledge or involvement. (Docket Entry No. 23 at 8).

GC Services posted a conditional offer letter dated March 1, 2017, to Ms. Little's iCIMS account. (Docket Entry No. 45-1 at 79–80). The document shows that an applicant used Ms. Little's iCIMS login and password to accept the conditional offer by electronically signing the document at 2:08 a.m. EST on March 2, 2017. (*Id.*). An email dated March 3, 2017, from GC Services to Ms. Little's personal email address confirms that someone using her iCIMS account had accepted the employment offer for permanent employment at GC Services. (*Id.* at 181). GC Services sent to Ms. Little's address another email on March 3, 2017, reminding Ms. Little to complete the additional onboarding documents. (*Id.* at 184).

Ms. Little denies signing the onboarding documents on March 4, 2017. In her trial testimony, she admitted that she did sign those same documents on March 3, 2017, excluding the Dispute Resolution Agreement and the conditional offer letter. She testified that the documents were opened on a computer in the GC Services human resources office for her to sign, and that she did not have to log in to her iCIMS account to sign them. She testified that she would not have signed them on March 4, because she did not work that day and she would not have completed work for GC Services from home. Ms. Little admitted that she did complete some online employment documents from home before starting her job at NextGen, but she maintained that she is "a creature of habit so nine times out of ten [she] wouldn't have [done] anything for GC Services at home."

Ms. Little's trial testimony presented the following timeline for the events in 2017:

- (1) on March 2, Ms. Little first learned from Jeanetta Parris that GC Services was hiring full-time for the call-center job she had been doing for NextGen;

- (2) Ms. Parris told Ms. Little that GC Services already had her employment-application information;

- (3) Ms. Parris gave Ms. Little a drug-test form on March 2;

- (4) Ms. Little completed her drug test on March 3;

- (5) on March 3, Allison Smith called Ms. Little down to the Human Resources Office, where she signed the onboarding documents presented to her, except for the Dispute Resolution Agreement and the offer letter;

- (6) Ms. Little completed these onboarding documents after her drug-test results were returned;

- (7) GC Services received Ms. Little's drug test results on March 4, and;

- (8) sometime later in March, Allison Smith, from GC Services's payroll department, called Ms. Little back to the Human Resources Office to ask her to sign the Dispute Resolution Agreement, which Ms. Little again refused to do.

Inconsistencies plague Ms. Little's version of events set out in the timeline and lead the court to find it unreliable and not credible. She offers no explanation for why or how someone could or would have submitted the GC Services employment application for her, without her knowledge or involvement. She offers no explanation for the ways the process she followed differed from GC Services's standard process. She offers no explanation for why or how someone else would have signed the same onboarding documents for her on March 4, when she claims to have already signed them on March 3, or why Allison Smith would have asked her to sign the Dispute Resolution Agreement in March when GC Services already had a signed copy timestamped February 26.

Ms. Little disputes the accuracy of the timestamps. But a GC Services internal chat log with Ms. Parris recorded Ms. Little agreeing to complete one more document on April 21, 2017,

at 7:59 p.m. CST, and the same completed document bears a timestamp of 8:59 p.m. EST on April 21. (Docket Entry No. 45-1 at 136–37; Docket Entry No. 46-1 at 124). Ms. Little testified that the exchange recorded in the chat log was not from her because it would have been "unprofessional" for her to call Jeanetta Parris "Mrs. J," as the chat user does. Ms. Little also denied that she knew about the GC Services permanent employment opportunity until March 2, even though she admitted visiting the GC Services Careers website on February 23, 2017, the very day Jeanetta Parris testified, credibly, that she gave Ms. Little a paper with the link to apply electronically. (Docket Entry No. 46-1 at 5).

GC Services's credible evidence contradicts and undermines the credibility of Ms. Little's version of events. Amber Taylor, GC Services's Human Resources Regulatory Compliance Director, testified that GC Services did not have access to individual users' login information for the iCIMS application system. Ms. Little does not dispute this. Ms. Little has not shown that her GC Services login was the same as her username and password for the iCIMS application system, and GC Services submitted evidence that the logins are distinct. In her deposition testimony, Jeanetta Parris denied telling Ms. Little that GC Services already had her information. (*Id.* at 160). The February 26, 2017, online application appears to be from Ms. Little and completed by her. (Docket Entry No. 45-1 at 1–14). Besides the login information itself, the application includes information about Ms. Little that would be difficult for another user to have access to, including her social security number, address, phone number, and work history. (*Id.*). The applicant name and the email address used to submit the online application to GC Services, and to communicate with GC Services, used the same email address that Ms. Little admits was her only email address. (*Id.*).

Some of Ms. Little's personal information was available to NextGen. Ms. Little emailed

her resume, with her work and educational history, address, and phone number to an employee at NextGen on February 20, 2017. (Docket Entry No. 41-6). But her social security number did not appear on her resume. (*Id.*). The resume Ms. Little sent to NextGen contained inaccuracies that did not appear in Ms. Little's GC Services online application. Ms. Little had worked at GC Services in May through October 2000, (Docket Entry No. 45-1 at 15), but she described this on her NextGen resume as experience at MCI WorldCom from 2001 to 2003. (Docket Entry No. 41-6 at 3). She testified that her resume did not state that she had previously worked for GC Services, but that the MCI WorldCom entry referred to time she had spent at GC Services. Ms. Little's online GC Services application correctly identifies her first employment at GC Services, though it states she worked there from April 2000 until November 2001. (Docket Entry No. 45-1 at 2). The GC Services online application misstates Ms. Little's high school graduation date as January 1, 1987, while the resume Ms. Little sent to NextGen correctly states the date as June 1987. (Docket Entry No. 41-6 at 4; Docket Entry No. 45-1 at 2). Ms. Little testified that her graduation date was the only inaccuracy in the online application form.

The inconsistencies between NextGen's information about Ms. Little's personal history, and the information on the GC Services online application, make it incredible that some unknown person at NextGen filled out and filed the GC Services online application for Ms. Little, without her knowledge. The absence of any clear reference to her prior GC Services employment precludes the likelihood that some unknown person at GC Services applied for her, without her knowing.

Ms. Little offered her Google browsing history for the only two devices she alleges gave her internet access, to show "no visits to any GC Services application on February 26, 2017." (Docket Entry No. 23 at 6; Docket Entry No. 45-1 at 169–74; Docket Entry No. 46-1 at 118–20, 183–196). She claims that her internet history also shows that she did not sign onboarding

documents on March 4. But Ms. Little's Google history does not contradict GC Services's evidence that she completed the online application form and signed the Dispute Resolution Agreement on February 26, 2017. Ms. Little has not shown that this Google activity log shows all of her online activity on February 26, 2017. The Google Help Center information Ms. Little presented states that "[i]f Web & App Activity is turned on, [a user's] searches and activity from other Google services are saved in [the user's] Google Account." (Docket Entry No. 46-1 at 118). "Searches and other things [a user] do[es] on Google products and services," including the user's browser history, are saved but only if the user is "signed into [her] Google Account and [has] Chrome Sync turned on." (*Id.* at 118–19). Ms. Little has not shown that she was using the Google Chrome browser and had Chrome Sync turned on. Nor has she offered other evidence that her Google activity log captured all her internet activity, not just her searches and activity on Google-related products. Additionally, Ms. Little has admitted, and the Google Help Center information confirms, that a user can delete activity from the log. (Docket Entry No. 46-1 at 118). Ms. Little has also admitted she is unable to provide her laptop's browser history, but testified that she uses only Google's Chrome browser, because her laptop is "glitchy."

The Google activity log shows a gap in activity at the same time the online application with Ms. Little's name, login, password, and personal information was submitted. (Docket Entry No. 46-1 at 9–10, 21–22). Ms. Little had "tethered" a device to her phone at that time, and her Google history does not show her internet activity on the tethered device, showing that Ms. Little could have completed the application as GC Services contends. (*Id.* at 9–10).

Ms. Little testified that she tethered her laptop to her phone only to play certain games and download pictures. But she admitted that she could not recall individual entries or what she was doing on particular webpages, including a visit to GC Services's website on February 23, 2017—

11

the day Jeanetta Parris gave Ms. Little the link to file the online application for GC Services employment. (*Id.* at 5).

Ms. Little also argues that her internet activity history shows she could not have completed additional onboarding documents on March 4, 2017. Again, Ms. Little has not shown that her Google logs captured all her internet activity, and gaps in the activity show that she could have completed the onboarding documents then. (*Id.* at 183–194).

To attribute the electronic signature to Ms. Little, all that is required is that the surrounding circumstances support the inference that she was responsible for the signature. The Texas Business and Commercial Code § 322.009 states:

> (a) An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.
>
> (b) The effect of an electronic record or electronic signature attributed to a person under Subsection (a) is determined from the context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement, if any, and otherwise as provided by law.

TEX. BUS. & COM. CODE § 322.009. GC Services's credible evidence refutes Ms. Little's version of events, which the court finds incredible and improbable. The court finds Ms. Little's testimony as to her application, incredible. Her timeline conflicts with the timestamped documents and the credible evidence showing GC Services's usual application procedures. The evidence that applicants cannot submit applications without electronically signing the Dispute Resolution Agreement; that Ms. Little's application contained personal information that Ms. Little has not shown others at NextGen or GC Services would have known; that Ms. Little's internet activity log is incomplete and shows no entries at the date and time she would have signed the Dispute Resolution Agreement; and that Ms. Little could not recall her internet activity for certain entries

12

near the time of application, all support that Ms. Little electronically signed the Dispute Resolution Agreement before submitting the application.

The court finds that Ms. Little electronically signed the Dispute Resolution Agreement.

## III. Conclusions of Law

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, permits a party to move to compel arbitration when an opposing party refuses to arbitrate issues covered by a valid arbitration agreement. 9 U.S.C. §§ 3, 4; *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2006) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). A court must decide "whether the parties agreed to arbitrate the dispute in question," which requires deciding whether: "(1) there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006) (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996)).

At the first step, the court evaluates "whether there is any agreement to arbitrate any set of claims." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016). "Although there is a strong federal policy favoring arbitration, 'this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (quoting *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)). The party seeking arbitration must show, by a preponderance of the evidence, that the arbitration agreement exists. *Banks v. Mitsubishi Motors Credit of Am., Inc.*, 435 F.3d 538, 540 (5th Cir. 2005); *Holmes v. Air Liquide USA LLC*, No. H-11-cv-2580, 2012 WL 267194, at *1 (S.D. Tex. Jan. 30, 2012), *aff'd* 498 F. App'x 405 (5th Cir. 2012); *see also Chester v. DirecTV, LLC*, 607 F. App'x 362, 363–64 (5th Cir. 2015) (per curiam). When a genuine factual dispute exists over the making of the agreement,

the party seeking to enforce the agreement must prove its existence by a preponderance of the evidence. *In re JPMorgan Chase & Co.*, 916 F.3d 494, 502–03 (5th Cir. 2019); *Chester*, 607 F. App'x at 364.

The court determines the existence of a valid contract under Texas state law.[3] *Banks*, 435 F.3d at 540. Traditional contract law governs arbitration agreements in Texas, *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003), which requires the party arguing validity to show: "(1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding," *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

To meet its burden, GC Services must show Ms. Little's assent. *See Effel v. McGarry*, 339 S.W.3d 789, 792–93 (Tex. App.—Dallas 2011, pet. denied). "When determining whether mutual assent is present, courts look to the communications between the parties and to the acts and circumstances surrounding these communications." *Holmes*, 2012 WL 267194, at *2 (citing *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). Because the court finds that Ms. Little electronically signed the Dispute Resolution Agreement, Ms. Little and GC Services mutually assented to the Dispute Resolution Agreement.[4]

---

[3] The Dispute Resolution Agreement states that "[t]o the extent any dispute requires the application of state law, the parties agree only the laws of the State of Texas shall apply, without regard to that state's laws or rules of choice of law." (Docket Entry No. 1-1 at 3). The parties do not challenge the application of Texas law.

[4] GC Services argues that because Ms. Little admitted reading an onboarding document that notified her that signing and agreeing to arbitration was a condition of her continued employment, and because Ms. Little continued working at GC Services, she assented to the Dispute Resolution Agreement regardless of whether she electronically signed it. (Docket Entry No. 33 at 9–10); *see In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex. 2002) (holding that an employee who disputed signing an arbitration agreement was still bound by his employer's arbitration policy because he received notice that the policy was a condition of continued employment, and he continued working). After trial, Ms. Little moved to amend her Proposed Findings of Fact and Conclusions of Law, to address whether she assented to the Dispute Resolution Agreement by continuing to work for GC Services. (Docket Entry No. 39). The court considered her

14

Ms. Little has challenged only that she assented to the Dispute Resolution Agreement, not whether it is enforceable. She has not pointed to evidence showing that federal law or policy makes the Dispute Resolution Agreement unenforceable. The court concludes that Ms. Little and GC Services entered into a valid, enforceable contract to arbitrate all disputes.

**IV. Conclusion**

The court finds and concludes that:

- Ms. Little electronically signed the Mutual Agreement for Dispute Resolution.
- Ms. Little and GC Services formed a valid, enforceable agreement to arbitrate all disputes.

The court will separately enter an order granting GC Services's motion to compel arbitration and to enjoin Ms. Little from pursuing her action in the Missouri state court pending the arbitration.

SIGNED on October 23, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

---

arguments, but because the court finds that Ms. Little electronically signed the Dispute Resolution Agreement, it is unnecessary to reach the issue.